### UNITED STATES v. GOLLIN et al.

#### Nos. 9819, 9821.

United States Court of Appeals Third Circuit.

Argued April 22, 1949.

Decided June 22, 1949.

Writ of Certiorari Denied Oct. 17, 1949.

See 70 S.Ct. 89.

Frederic M. P. Pearse, Newark, N. J., for appellant Gollin.

Harold Simandl, Newark, N. J., for appellant Richman.

Charles J. Tyne, Asst. U. S. Atty., Newark, N. J. (Alfred E. Modarelli, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge and McLAUGHLIN and O'CONNELL, Circuit Judges.

BIGGS, Chief Judge.

Nathan Gollin and Benjamin Richman at their second trial, as at their first, were convicted in the court below on an indictment of two counts charging each of them with violation of the Act of February 13, 1913, c. 50, Section 1, 37 Stat. 670, as amended by the Act of January 28, 1925, c. 102, 43 Stat. 793, as amended by the Act of January 21, 1933, c. 16, 47 Stat. 773.[1] The crimes of the defendants were committed either on the night of June 14 or early in the morning of June 15, 1946. It

---

[1] The statute in force on June 14–15, 1946, in pertinent part was as follows: "Whoever shall unlawfully break the seal of any railroad car containing interstate or foreign shipments of freight or express, or shall enter any such car with intent in either case to commit larceny therein; or whoever shall steal or unlawfully take, carry away, or conceal, or by fraud or deception obtain from any railroad car, station house, platform, depot, wagon, automobile, truck, or other vehicles, or from any steamboat, vessel, or wharf, with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight or express, or shall buy or receive or have in his possession any such goods or chattels, knowing the same to have been stolen; or whoever shall steal or shall unlawfully take, carry away, or by fraud or deception obtain with intent to convert to his own use any baggage which shall have come into the possession of any common carrier for transportation from one State or Territory or the District of Columbia to another State or Territory or the District of Columbia or to a foreign country, or from a foreign country to any State or Territory or the District of Columbia, or shall break into, steal, take, carry away, or conceal any of the contents of such baggage, or shall buy, receive, or have in his possession any such baggage or any article therefrom of whatever nature, knowing the same to have been stolen, or whoever shall steal or shall unlawfully take by any fraudulent device, scheme, or game, from any passenger car, sleeping car, or dining car, or from any passenger or from the possesion of any passenger while on or in such passenger car, sleeping car, or dining car, when such car is a part of a train moving from one State or Territory or the District of Columbia to another State or Territory or the District of Columbia or to a foreign country, or from a foreign country to any State or Territory or the District of Columbia, any money, baggage, goods, or chattels, or who shall buy, receive, or have in his possession any such money, baggage, goods, or chattels, knowing the same to have been stolen, shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both, and prosecutions therefor may be instituted in any district wherein the crime shall have been committed or in which the defendant may have taken or been in possession of the said money, baggage, goods, or chattels. The carrying or transporting of any such money, freight, express, baggage, goods, or chattels from one State or Territory or the

follows therefore that the amendment of July 24, 1946, c. 606, Section 1, 60 Stat. 656, was not in force at the time of the theft. The statute as amended, including the amendment last referred to, was embodied in Section 409 of Title 18 U.S.Code, 1946 ed. [now 18 U.S.C.A. §§ 659, 660, 2117]. The statute as it was prior to the amendment of July 24, 1946, was included in Section 409 of Title 18 U.S.Code, 1940 ed. These observations will be seen to be pertinent hereinafter. Cf. note 1 cited to the text in our prior opinion, 166 F.2d 123, at page 124. The first count of the indictment charged Gollin and Richman with stealing 600 cases of beer moving as and constituting freight in the course of shipment in interstate commerce. The second count charged wrongful possession of the stolen beer. Both defendants were found guilty on both counts and were sentenced to two years on each count, the terms to run concurrently. Both defendants have appealed.

The facts are substantially the same as were before the court in the first appeal.[2] We shall note some small discrepancies later. Briefly set forth the facts are as follows. P. Ballantine & Son ("Ballantine") owns and operates a brewery occupying 9 or 10 adjacent city blocks in Newark, New Jersey. The brewery is near the outskirts of the city and Ballantine makes full use of the city streets adjoining the buildings for the parking and loading of trucks incidental to the operation of the plant and the shipping of its product in both intra- and interstate commerce. On the evening of June 14, 1946, a truck, No. 327, owned by Ballantine and licensed for interstate commerce by the Interstate Commerce Commission, was moved to a loading platform on Christie Street in front of one of Ballantine's plants and was loaded by Ballantine's employees with 600 cases of bottled beer. After the loading had been completed by the loaders, Borowsky, a loader, but qualified also as a driver, pulled the truck a few feet away from the loading platform. A checker, Baumgartner, then checked the load, and sealed the trailer doors[3] albeit they were not locked.

After the truck was sealed Borowsky procured the bill of lading, which had been previously filled in and signed by the warehouse foreman, Pearson, and signed it " * * * to release the truck from the platform". The shipment was consigned to Luberger, North Tarrytown, New York. Borowsky[4] then moved the truck approximately two blocks and parked it on the street opposite the company garage maintained by Ballantine, where it was to await the arrival of two previously assigned

District of Columbia into another State or Territory or the District of Columbia, knowing the same to have been stolen, shall constitute a separate offense and subject the offender to the penalties above described for unlawful taking, and prosecutions therefor may be instituted in any district into which such money, freight, express, baggage, goods, or chattels shall have been removed or into which they shall have been brought by such offender. The words 'station house' 'platform,' 'depot,' 'wagon,' 'automobile,' 'truck,' or 'other vehicle,' as used in this section, shall include any station house, platform, depot, wagon, automobile, truck, or other vehicle of any person, firm, association, or corporation having in his or its custody therein or thereon any freight, express, goods, chattels, shipments, or baggage moving as or which are a part of or which constitute an interstate or foreign shipment."

2 See 166 F.2d 123, 126, certiorari denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151. We reversed the judgments of conviction because the court below had inadvertently employed language in its charge to the jury which "instructed" the jury as to what the evidence was regarding interstate commerce and then informed them that under "this state of facts" the truck and its contents were in interstate commerce. We deemed this to be the equivalent of instructing the jury to bring in a verdict of guilty which the court was not entitled to do. The defendants were again convicted at their second trial and have appealed again.

3 It is not clear from the record what kind of seal was used. The loader testified it was sealed with " * * * a regular licensee's seal; ICC seal, I imagine." No doubt it was a seal of the type issued by the Interstate Commerce Commission to those licensed under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.

4 Borowsky did not load the truck, but stated he was present while two loaders placed the beer on the truck.

drivers. He removed the keys from the truck, placed them on a rack in the garage and inserted the bill of lading through the key ring. About two or three hours later the truck was discovered to be missing. It was located about 4 A. M. on Sherman Avenue in Newark, New Jersey. The seal had been broken and the beer removed.

Emer, the assistant delivery superintendent of Ballantine, testified that among his duties was that of scheduling drivers to drive the company owned trucks and trailers. He stated that he had prepared the assignment sheet[5] for company trailers for June 15, 1946 in quadruplicate and had posted it during the afternoon of June 14 between the hours of 12 noon and 4 P. M. He testified that the original sheet had been posted on the bulletin board at plant No. 1 near the time clock where the drivers "punch in" for starting work. A copy had been posted in the dispatch office, a second copy turned over to "a man named Coyne,"[6] and a third was kept by Emer for his records. Emer further testified that under the usual practice at Ballantine the drivers would have checked the assignment sheet each night to see the time they were to leave on the following morning and, on reporting in the morning to the dispatch office would first locate the truck assigned to them and would then go to the dispatch office and sign out for the truck. Emer stated that the truck keys might be at either the dispatch office or at the garage.

The defendants assert that certain highly persuasive "new facts" were brought into the record at the second trial, facts which were not introduced at the first hearing. A careful examination of the records of the first and second trials discloses the following new items of evidence. Borowsky was actually a loader and truck No. 327 was not loaded by him. Drivers of brewery trucks and trailers examined after four o'clock in the afternoon on the day preceding the day

on which they were to take trucks out the assignment sheet or daily trailer schedule, designating them to trucks or trailers. See the summation of the testimony of Emer referred to previously in this opinion and note 5, supra. It was the practice for drivers to "sign out" at the company garage. There was introduced into evidence a sheet headed "Checker's Sheet No. 38,801" relating to truck No. 327. This contains the legend "Truck repairs needed" with a line left blank to indicate the necessary repairs. This line contains no notation.[7]

The defendants contend that the gist of the offense defined by the statute makes it a crime for any person to steal from a truck goods " * * * moving as or which are part of or which constitute an interstate * * * shipment of freight * * *". They assert that Borowsky who first moved the loaded truck a few feet from the loading platform before it was sealed and later, after it had been sealed, parked it about two blocks from the loading platform on a public street, was a loader and not a driver and that therefore no interstate movement had commenced. They stress the fact that a driver would not start any journey, intrastate or interstate, until he had signed out and that if " * * * for any reason, he was not allowed to 'sign out' he would not obtain possession of the truck nor would the interstate journey begin." They lay much emphasis on the decision of the Supreme Court in Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 475–476, 47 S.Ct. 170, 172, 71 L.Ed. 359, wherein Mr. Chief Justice Taft stated, "The conclusion in cases like this must be determined from the various circumstances. Mere intention by the owner ultimately to send the logs out of the state does not put them in interstate commerce, nor does preparatory gathering for that purpose at a depot. It must appear that the movement for another state has actually begun and is

---

[5] See Exhibit G-10. A copy of the Daily Trailer Schedule was introduced into evidence. It designated, inter alia, trucks (or trailers) by number, the destination, the time out, and the drivers assigned to each truck. The schedule indicates that Emer had assigned two

drivers to truck No. 327 to go to North Tarrytown, New York, and had scheduled them to leave at 7 A. M. on June 15.

[6] Who Coyne was is not disclosed in the testimony.

[7] See Exhibit No. G-7.

going on. Solution is easy when the shipment has been delivered to a carrier for a destination in another state. It is much more difficult when the owner retains complete control of the transportation and can change his mind and divert the delivery from the intended interstate destination as in The Champlain Company case [Champlain Realty Co. v. City of Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309, 25 A.L.R. 1195]. The character of the shipment in such a case depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it out. The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if the other facts show that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation, as in the Champlain case."

The question presented for determination by the Supreme Court in the Hughes case was whether the State of Minnesota could tax personal property which was in actual transit in interstate commerce. The Supreme Court decided that the State of Minnesota could not do this. There is a clear suggestion in the opinion that when a shipment has been delivered to a carrier for destination in another State the goods are in interstate commerce though the Court points out that the question of goods are or are not in interstate commerce is much more difficult to decide when the "owner" retains complete control of the transportation as in the case at bar. In the instant case Ballantine would have retained control of the beer until its actual delivery to the consignee at North Tarrytown, New York.

■ But here the statute, as will be observed for example from an examination of the pertinent statute, defines the offense not only as the stealing of goods from a shipment actually in interstate transit but also as a stealing of goods " * * * which constitute an interstate * * * shipment * * *." In addition, stealing from a "railroad car", "truck", "station house",

"platform", "terminal", and "wharf" are included within the ambit of the law. The last sentence of the statute expressly provides that the word " 'truck' shall include any truck * * * of any person, firm, association or corporation having in * * * its custody *therein* or *thereon* [8] any freight, express, goods, chattels, shipments or baggage moving as or which are a part of or which constitute an interstate or foreign shipment." In distinguishing between goods actually moving in interstate commerce and goods which constitute an interstate shipment, the disjunctive "or" was employed by Congress, indicating, we think clearly, the congressional intent to create two classes of goods within the purview of the statute. It follows that the stealing of property which "constitute" an interstate shipment is as much an offense under the law as stealing goods actually in transit in interstate commerce. That Congress had the power under the Commerce Clause, art. 1, § 8, cl. 3, to include the category of goods first mentioned in the preceding sentence within the ambit of the statute is clear. Cf. United States v. Darby, 312 U.S. 100, 115–116, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Wickard v. Filburn, 317 U.S. 111, 120–124, 63 S.Ct. 82, 87 L.Ed. 122. The verb "constitute" is defined as "To set or station in a given situation, state or character" or "To fix or determine, as a trait or characteristic." [9] The test supplied by the statute therefore is whether or not the beer in the instant case had been *constituted* as an interstate shipment or whether it was *moving* in interstate commerce prior to the theft.

■ We think that in the instant case the beer constituted an interstate shipment. Its segregation as such a shipment by Ballantine had been completed. It had been sealed within the trailer and a bill of lading had been made out. The fact that Ballantine, the producer, was also the shipper, makes no substantial difference. The drivers had only to pick up the keys, the bill of lading and to sign out. Had the truck remained at the loading platform we would reach a similar conclusion. Indeed, the

---

[8] Emphasis added.

[9] Webster's New International Dictionary, 2nd ed.

statute is intended to cover even the situation in which goods segregated for interstate commerce on a platform, at a terminal, or at a depot, have been stolen. The acts to be performed by the drivers in the instant case, viz., to pick up the keys and the bill of lading, to sign out and to drive the truck away, cannot be deemed to destroy the status of the shipment as interstate commerce. The segregation and constitution of the shipment for interstate commerce had been completed.

The defendants contend to the contrary. Relying on United States' v. Yellow Cab Co., 332 U.S. 218, 231, 67 S.Ct. 1560, 1567, 91 L.Ed. 2010, they insist that the interstate journey of the beer must have been commenced in the most literal sense, i. e., by transportation of the beer on the road from point of shipment to point of consignment, in order for their acts to be cognizable under the statute. In the Yellow Cab case the Supreme Court, by Mr. Justice Murphy, concluded that although in a sense a traveler starts · an interstate journey when he boards a conveyance near his home or office to travel to the railroad station from which the journey is continued by train, nonetheless · "* * * interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518; North American Co. v. S. E. C., 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945. And interstate journeys are to be measured by 'the commonly accepted sense of the transportation concept.'" The defendants seem to take the position that the Yellow Cab case demonstrates that the concept of interstate transportation requires literal *movement* of the shipment on an interstate carrier. But it may be pointed out that in the same paragraph from which the preceding quotation is copied Mr. Justice Murphy also said that "* * * what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations." The Supreme Court was construing the Sherman Anti-Trust Act, 26 Stat. 209, as amended, 15 U.S.C.A. §§ 1–7, 15 note, and the concept of interstate commerce under that Act is of course somewhat different in scope from that of the statute at bar. It may be concluded fairly from the words of Mr. Justice Murphy that the concept of interstate commerce in goods is wider than that of the interstate journey of the individual traveler, and that considerations of a very practical nature must determine in each case arising under each statute whether goods or persons are in the stream of interstate commerce.

■ Assuming arguendo that the contention of the defendants that there must be an actual commencement of movement in interstate commerce is correct, nonetheless we are of the opinion that there is ample testimony in the record of the second trial (as there was in the record of the first) to support the conclusion that a transfer or movement in interstate commerce had actually been begun before the theft took place. The beer had in fact been moved from the loading platform and placed in the truck. The truck itself had been moved, after its contents had been sealed and the bill of lading had been made out, to a point on a public street about two blocks from the loading platform; that is to say, the truck and its contents had commenced the movement which had been designed ultimately to take them to North Tarrytown. The fact that the truck had been driven two blocks from the platform by a loader, Borowsky, rather than by the drivers designated in the schedule to take the shipment to North Tarrytown, seems immaterial. Under the circumstances we think the jury was justified in concluding, as it apparently did, that interstate movement had actually commenced. While the truck had been halted before the theft took place, the halt was temporary and was to endure only until the previously assigned drivers arrived to continue the movement. Moreover, Emer testified that trailer No. 327 had been assigned for an interstate journey to New York prior to its loading, and its status as an interstate carrier became fixed when the beer was loaded and the trailer sealed. The

contents of the truck were therefore clearly within the purview of the statute.

In view of all of the foregoing we reach the conclusion that the court below did not err in denying the defendants' motions for directed verdicts of acquittals. The court below left these issues of fact to the determination of the jury under what we conclude, for the reasons set out hereinafter, were substantially correct instructions.

The court in the instant trial charged the jury in terms of the law as set out in our previous opinion in this case, 166 F.2d 123. The trial judge stated that "The Circuit Court of Appeals of this circuit has determined that commerce begins when the transfer of the commodity to another State is actually commenced. It necessarily follows that the burden is upon the Government to prove, if it is to sustain the charge in the indictment, that at the time of the theft the transportation of the merchandise in question had actually commenced." The substance of this part of the charge was repeated from time to time. It was of course more favorable in tenor than the defendants were entitled to under the statute, for, as we have endeavored to demonstrate, theft of goods in interstate commerce is cognizable under the statute before actual physical transportation upon an interstate highway has begun. But both counts of the indictment were phrased in the conjunctive, not in the disjunctive. The counts charged the defendants with stealing goods which had been constituted an interstate shipment and which were moving in interstate commerce.

As we have previously stated the last amendment to the statute which had come into effect at the time the offenses were committed was that made by the Act of January 21, 1933, 47 Stat. 773, and this has been embodied in Section 409 of Title 18 U. S. Code 1940 ed. The indictment was returned by the grand jury on December 10, 1946. The indictment contains a note; viz., "Title 18 U.S.C. Section 409", written immediately below the line designated for the number of the indictment and at the end of each count the following notation also appears: "(Title 18 Section 409)". Since the 1946 edition of the United States Code was not promulgated until April 15, 1947 and contained, according to its title page, "* * * The general and permanent laws of the United States, in force on January 2, 1947", we think it is clear that the United States Attorney of the District of New Jersey properly referred in the indictment to the 1940 edition of the United States Code. But the trial court stated in its charge to the jury: "It may be well to direct your attention to the definition of interstate commerce embodied in the statute. Interstate commerce as defined by statute is as follows: 'The term interstate shall include transportation from one state to another state.'" This definition, with certain immaterial omissions, was quoted in haec verba from Section 409(c) of Title 18 of the United States Code 1946 edition, as is made clear by a subsequent reference to the definition of the term interstate commerce made by the trial judge and referred to hereinafter. It came into Section 409, as we have stated, by virtue of the Act of July 24, 1946, 60 Stat. 656. The trial judge, therefore, was technically in error in treating the definition as part of the statute under which Gollin and Richman were indicted. The technical error is of no consequence, however, since the definition was a correct one and was in fact subsequently embodied in the law. No exceptions were taken by the defendants to any part of the charge.

The jury remained out about two and a half hours. It then returned with the following request and question for the court, "Your Honor: Will you please read again the statute regarding interstate commerce. Should it be decided that it is not interstate commerce would that affect the other two counts?" The court, the Assistant United States Attorney and counsel representing the defendants were in doubt as to what this question meant. The court, inter alia, then repeated the definition of the term interstate commerce "from the statute" without objection from any party and, at the request of the Assistant United States Attorney, further said to the jury. "You are instructed that if you determine that the evidence offered by the Government in support of the allegation that the commodity

in question was part of or constituted an interstate shipment is credible; if you *further* [10,11] determine that it satisfies you beyond a reasonable doubt that the merchandise in question was in interstate commerce, that is that the interstate transportation had actually commenced, then you may in the exercise of your judgment and discretion as the sole judges of the issue of fact determine that the goods were in interstate commerce."

■ As stated, we have concluded that the statute sets up two distinct conditions under which the offense may be committed: one by stealing goods which *constitute* an interstate shipment; the other, by stealing goods actually *moving* in interstate commerce. As we have pointed out the evidence was sufficient to enable the jury to find that the beer had been constituted an interstate shipment and also to find that the movement of the beer to another State had actually commenced. The trial court required the jury, as we read the charge, to find not only that the beer had been constituted an interstate shipment but also and in addition thereto that the movement to another State had actually commenced. This was what the indictment charged. The charge was more favorable to the defendants than they were entitled to receive under the statute and the instruction may not be deemed to be even technically erroneous in view of the form of the indictment. In any event, no prejudice whatsoever resulted to Gollin and Richman therefrom. Their trial was fair and just throughout. An examination of the entire records demonstrates this. See Section 2111 of Title 28 United States Code Annotated, as added by Section 110 of the Act of May 24, 1949, Public Law 72.

Accordingly, the judgments of conviction will be affirmed.

McLAUGHLIN, Circuit Judge (dissenting in part).

According to the majority opinion, appellants could have been convicted not only for the stealing of goods from a shipment in interstate commerce but also for stealing of goods constituting an interstate shipment which latter would not necessarily involve an actual moving in interstate commerce. Assuming that the majority construction of the particular statute [1] is correct, such a situation could arise—it might possibly have arisen in this case but in fact did not.

Under the instant indictment there had to be a commencement of movement in interstate commerce in order to justify a verdict of guilty. It is true that the statutory language is disjunctive. It reads: "Whoever shall steal * * * any goods or chattels moving as *or* which are a part of *or* which constitute an interstate or foreign shipment * * *." (Emphasis supplied.) The indictment, however, while based on the statute, does not follow the statutory language. Its first count reads that the defendants "did * * * steal * * * 600 cases of bottled beer * * * shipped by P. Ballantine & Sons, at Newark, New Jersey, and consigned to Charles Luberger at North Tarrytown, New York, *in the course of shipment in interstate commerce,* all of which said goods and chattels were then and there in the custody and possession of P. Ballantine & Sons at Newark, aforesaid, and not as yet delivered to the consignee and which said goods and chattels *were moving as, formed a part of and constituted an interstate shipment of freight in the course of shipment in interstate commerce."* (Emphasis supplied.)

The critical language of the second count is the same.

If the majority view of the statute is sound, then the indictment under which these appellants were tried, differs radically from the statute. Whatever be the situation as to that, the only offense the indictment charges and the only offense for which these appellants could be convicted under it, is that the beer constituted an interstate shipment, the interstate movement of which had already begun.

---

10 See p. 210 of the transcript.
11 Emphasis added.

1 37 Stat. 670, amended 43 Stat. 793, amended 47 Stat. 773, 18 U.S.C.A. § 409.